Mr. McCormick for the petitioner, Mr. Hickson for the respondent. Good morning, Your Honors. I'm Kevin McCormick. I represent the petitioner in this case, Oberthur Technologies. We're here today for a couple of different issues because the petitioner is trying to set aside the unit determination and the certification that the NLRB made, and the NLRB is here, of course, petitioning to enforce the unfair labor practices that were found. I'd like to first argue, address the first issue, which is the unit determination. We believe that the NLRB and the ALJ got it wrong. They didn't follow their correct procedures in this case. As you know, it was a closely contested case. It was 108 votes for the union, 106 for the company, and there were three challenged ballots. One turned out not to be, it didn't have any merit, but the two that are at issue in this case were two employees, DeTore and Sejuani, who were engineers, and they're in the quality control department of Oberthur Technologies. Now the question, and this is where I think the NLRB went off the rails on this, is the Desert Palace standard, which is based on this court's pronouncement of associated milk producers, says that when you have a situation where you have a unit determination issue, you look at the clear language of the unit that's described in stipulation to determine whether or not it's confusing or it's ambiguous, and if it's not, then you accept the stip that's been agreed to by the parties and approved by the regional director, and you proceed. In this particular case, we submit that the stip was very clear, that it included everyone in the quality control department, which included a number of different employees, and it had two individuals, it actually had three. There were three engineers who were in that quality control department. Two of them were challenged, one wasn't. So the unit, as we have right now, has an engineer in the unit, which we believe would be improper under any circumstance. But anyway, the three-prong test wasn't followed by the NLRB in this case. They ignored Desert Palace, and they decided instead to simply carve out the two individuals who they determined to be professional engineers. And we believe that's improper because under board precedent, particularly- Did you object to this at the time of the certification? We objected after the decision came down, but we didn't file objections to the election at the time because we weren't sure- Is that a fatal- I don't think so. I don't think so. I think in the dissent, Judge Miscamara indicated that the Teckwell case doesn't really control on this one. He was in dissent in Teckwell, though. He was in dissent. He was, but he still has good argument, I believe. Yeah, but he noted even in his dissent that that might still be the rule. Well, but the issue we had here on the waiver point, if I just might say, I mean, it's easy to say in hindsight, well, we should have done this and that. We believe that these two individuals should have been included in the unit. Nobody raised the issue of professional status at all until the election. And even at the election when they challenged him on that, they allowed another one, Khalid Hasim, to continue. And he voted without objection. So with that juncture, it's kind of hard to say that we should have immediately invoked the sonotone procedures, and that's what we should have done in this case. We believe that if the board were to conclude that they were professional engineers and they shouldn't be in the unit, that under sonotone, what they would have done was rerun the election and give the two individuals who were deprived their right to vote in this election the opportunity to participate in that. So I don't believe it's a fatal. And anyway, in any case, the Sunrise case, which we cite in our papers, is one where this precise issue was litigated and handled, and there's no evidence in that decision that anybody made any objections within seven days of the election. So I think that it's not a fatal defect in this particular case. The facts of this case are very unusual. In any event, we believe that the board should have followed the sonotone procedure if they determined that these individuals were engineers and they shouldn't be in the unit, to give them an opportunity to vote. There was also the other issue that the board didn't address, was by all accounts, and there's no challenge to this, Khalid Hussein, who was another engineer in the QC department, voted, and no one challenged that. So at a very minimum, if the board is concerned about the propriety of the unit and having professionals and non-professionals in the unit, on that basis alone, we believe that the case should be remanded back so that these three individuals could be given the sonotone rights to decide if they want to be included in the unit or not. And that wasn't done in this case. Now, with regard to the other part, the petition to enforce, we believe that the board's tested substantial evidence and whether or not there's substantial evidence to support their findings. And there's two basic issues in the case. One had to do with comments by one supervisor about, I want you to work and you shouldn't talk about union issues in work areas during work time. And the board from that decided that that was enough to pollute the environment for the election so that it was an unfair labor practice and that it would be a basis to set aside the election. We believe that it's taken way out of context. It was one supervisor who made that comment. The language, there are cases the board has filed in the past. UARCO and Wal-Mart, both of them, or actually, I'm sorry, it's Davison and Powerway, C-Powerway, are cases where the board has said, and the courts have approved it, companies do have the right to remind people that they should be working during work time. And in any event, we don't believe that those violations were sufficient enough to set aside an election. The other issue we had were reminding somebody that they should be working during work time. It's a little bit different than what was alleged here. The board found here, right? They singled out a type of speech and it was forbidden, and that was the only type of non-work-related speech that was forbidden. That's the gravamen of the concern here. You're right, Your Honor. He did not talk about union issues in the workplace. That was the only thing they couldn't talk about in the workplace. I understand that. The second part of this has to do with the ULPs that were charged against Oberther for delaying two types of discretionary pay increases. One was a spot bonus that the company had a policy of going around. There was no formula or set procedure. If somebody did something that was extraordinary or something nice, they would give them a spot bonus of $50 or $100 for that. Purely discretionary. The second were step increases that were available to certain employees as they worked up through their progression in the company. Those were discretionary as well because there were some timelines on it, but it wasn't fixed like an annual increase that takes place on May 1st. Can we pause over this for a minute? The NLRB says that the spot bonuses had already been approved for Merle Coral and other employees and that the wage increase for Marrero had been approved and that the wage increase for Dolowowski, Jimenez-Perez, and Garcia had been previously scheduled. So even if any of these are discretionary, in this case, they had already been approved and or scheduled. Is that right? I believe it's correct, Your Honor, but the problem we have still is the concern that the company had, which is to give any type of, whether it's scheduled or not, increase during the critical period of time before an election. That's a different matter. You were saying these are purely discretionary. Maybe they're given. Maybe they weren't. In this case, they had already been approved. It was no longer as if you were making a decision during the period. Well, it's true, but there are cases, Your Honor, which found that even when you have announced an annual increase that comes in and the company comes back and says, no, we're not going to do that, that that can be a problem. The concern that we had wasn't that we weren't going to pay it, and it's true that the language that was used to describe to the employees that these increases, the various increases were going to be put on hold, didn't have the magic words that the court looks at. But if you look at the sum and substance of what was done, I would think that it isn't as fatal as the board would have thought. What sum and substance are you referring to? The language that we, I mean, I believe it was Diane Ware who had a memo out that was explaining that we couldn't make the payments because it would look as if we were buying votes at this time, so they were going to be delayed. And that's exactly what happened. This was the email that didn't get distributed to the employees at all? No, but it was distributed to the supervisors who, in turn, mentioned it to the employees that these were on hold. It came up in two, at least one way, I know, because one of the employees... Let me just hold for one second. So the requirement, which doesn't require magic words, is at least indicate that they're going to get the bonuses regardless of whether a union wins or the union loses, right? That's correct. So I'm looking at the Ware email, and it says, and this is an email to, I guess, supervisors. It says in capitalized, Please note we cannot say things like it's because of the union. Hopefully with the phrase during this period, employees will realize that it may be linked to unions, but we cannot draw that conclusion for them. So if this actually did go to the employees, wouldn't it look to an employee like you were saying that you vote for the union, you don't get the wage increase? Well, Your Honor, you're correct. It was an email that went to supervisors, and the supervisors were supposed to relay that information. Right, but you're saying that this particular email is something we can rely on as satisfying the requirements for the exception, and if we relied on it, it would be against you because it was focused very much on it's all because of the union. Well, it also had language in there explaining what they couldn't say, too, to make sure that the supervisors wouldn't say the incorrect item. It wasn't artfully phrased, it's true. So, Your Honor, I think the, I'm over my time. The relief we're looking for in this case is to have the case remanded back to the board to reconsider this whole issue with the Sonotone election and the Desert Palace standard because we believe that the unit that's presently constituted, that the board is certified, is imperfect. Without any question, it has a quality control engineer in that group. Now, the board has said that quality control engineers are professional, and they shouldn't be in that group. So we believe that the case should be remanded so that that issue could be resolved at the STIP level or a hearing could be held as to what could happen and then have another election so that everyone could be done. What the board did in this case was took a shortcut, which I think in Sunrise the board said you shouldn't do. Okay, thank you. We'll hear from the NLRB. Thank you. May it please the Court, Michael Hickson for the NLRB. Before the board, the company made two basic arguments about the election in this case. One of them was timely and one of them was untimely. The timely argument, which dealt with the merits of the ballot challenges, was that the two challenged engineers, Mr. DeTore and Mr. Sahajewani, were not professional employees. And on that argument, the company cannot prevail because substantial evidence supports the board's finding that they were, in fact, statutory professionals. And I'd like to talk a bit about that finding, if I could, before turning to the company's second and untimely alternative argument that if the board was right, that if the two engineers were professionals, that the board should throw out the entire election and order a rerun. What the board did here in finding Mr. DeTore and Mr. Sahajewani to be statutory professionals is precisely what it was supposed to do. It focused on the specific work duties of those two individuals and applied the factors identified in Section 212 of the Act, finding that each of those factors was satisfied. Substantial evidence supports the board's finding that their work requires knowledge of an advanced type. These two engineers do very specialized work. There's no one else in the plant that does what they do. Their supervisor, Mr. Blasek, testified, in fact, that he's only able to understand what they do and to evaluate their work because he himself has an engineering education and background. Each of these individuals holds three degrees from institutions of higher learning. For each of them, that would include a bachelor's in engineering as well as an engineering-related master's degree. And it's totally uncontroverted based on the testimony from Mr. DeTore, Mr. Sahajewani, as well as Mr. Blasek, that without their very extensive education, they could not do their jobs. The board also found, rightly, that their work is predominantly intellectual and varied and not routine or standardized. Their work consists primarily of the mental effort of applying their advanced knowledge, their advanced engineering knowledge, to concrete problems, opportunities in the workplace. And it's highly varied because they work across all departments. Mr. Nixon, because your opponent didn't really address this question and put most of his emphasis on the sonotone issue, maybe it would be better use of your time if you'd answer his question. Certainly. Well, the board acted within its broad discretion in rejecting the company's alternative argument that if the two challenged engineers are professionals, the board should nullify the election, forcing all 229 employees to vote again so that Mr. DeTore and Mr. Sahajewani could vote using sonotone ballots. It's really important, I think, to appreciate the sequence of events here and how they unfolded with respect to the board's established principles and procedures in its representation in case law. The parties voluntarily entered into a stipulated election agreement, and the regional director approved that stipulation. The regional director acted properly, and the company does not contest this point. It's a very critical point. The regional director acted properly in approving the stipulation because under the board's settled principles, the regional director's role when the parties choose to enter into a pre-election stipulation is merely to review the document on its face and to approve it as long as it's facially valid, to disapprove it if it's facially invalid. The regional director then proceeded to conduct the conventional election that the parties asked for. And again, the regional director acted properly here because there was nothing to put the RD, excuse me, the regional director, on notice that there might have been professional employees in this unit. I should have mentioned this before. The stipulation, it defines the unit. Well, first of all, it asks in identifying the ballot language. It clearly calls on the regional director to run a conventional election, a non-sonotone election with the regular ballot questions that appear in a standard election. The unit is defined in terms of all full-time employees in, essentially, and then it lists a number of departments. As the board found, rightly, there is nothing on the face of those stipulated terms to indicate that that unit might have included professional employees along with the non-professionals. And as I noted, no one brought any other information, anything outside of the stipulation, to the regional director's attention prior to the election to put her on notice that there may have been professionals in this unit along with non-professionals. So there was no reason for the regional director to believe that there may have been any Section 9B1 problem here. During the election, the union challenged Mr. Torrey's and Mr. Sahajewani's ballots. The company did not challenge anyone's ballots, and critically, the company did not file any election objections within the deadline established by the board's rules, which is seven days from the tally of ballots. The tally of ballots was issued on the same day that the election was conducted, September 7th. And so the company had until September 14th to file objections either to conduct affecting the results of the election or objections to the conduct of the election itself. For example, asserting that the election was improperly conducted in that sonatine ballots should have been provided to Mr. DeTorrey and Mr. Sahajewani. It didn't do that, and it didn't do that even though it knew that a conventional election was conducted. It knew at the moment that the polls closed on September 7th that the union had challenged the ballots of Mr. DeTorrey and Mr. Sahajewani. And remember, the company, it's their employer. It knows what they do. It knows their work responsibilities. It knows their work duties. It always had the knowledge that it needed to assess their status as professionals under Section 212 of the Act. And, in fact, it admits in its opening brief that it was made aware of the alleged professional status of these two individuals at the time of the election. That's on September 7th. So then it had seven more days until September 14th to file objections. It didn't do that, and it continued to raise no objection. It continued to fail to assert in any other manner to bring to the board's attention the charge that the election had somehow been improperly conducted until more than six months later after the objections deadline has passed. And that's simply not permissible under the board's rules and regulations as this court recognized, for example, in the Sundor-Brands case cited in our case where this court held that the board properly declined to consider a company's objection that had been raised after the seven-day deadline passed. The board then, in agreement with the judge, sustained the challenges to Mr. DeTorrey's and Mr. Sahajewani's ballots. And, again, the board acted properly because the evidence shows, evidence supports the board's finding that these two individuals are, in fact, professionals under Section 212 of the Act, and they were not afforded the special self-determination vote that Section 9b-1 mandates before they could be combined with nonprofessionals. The company, indeed it seems to me, the company does not contest that if Mr. DeTorrey and Mr. Sahajewani are professionals, the board could not overrule the challenges to their ballots because Section 9b-1 clearly prohibits that. The board then was required to sustain the challenges. And it's well settled under board law and court law, which we've cited in our brief, that when the board resolves challenged ballots in a stipulated unit case, it's not going to enforce the stipulation or the intent of the stipulating parties. If doing so, it would contravene the statute. Which case is that? Your Honor, it would be NLRB Speedway Petroleum, Seventh Circuit. Hall State Communications is a board case from 2006. Jaclyn Manufacturing, Second Circuit. Brown Machine and Foundry, Eighth Circuit. I don't have the page in our brief, but it's in our brief, Your Honor. There's a couple other in there as well. Any merit to their claim that there is one person who is similarly professional and not excluded? No, Your Honor, no merit, and for a couple of reasons. The first is, as the board noted, it's well established from back in the Supreme Court's case in A.J. Tower to the present that a party cannot contest a board's certification of election results by challenging the eligibility of a voter after that individual's ballot has been cast and commingled with the other votes. It's lost its identity. And that's what their argument boils down to here about Mr. Hussain. Furthermore, the board's finding of professional status was not contrary to the company's claim based on these other employees' mere job title as engineers. So there's no merit to its assertion that because they all had engineer job titles, they must all be professionals. In fact, there's no evidence in the record to establish the nature of the work that this other fellow, who actually doesn't work in the Quality Control Department, I think he works in the Graphics Department, but there's no evidence of what it is that he does. And, in fact, the evidence is that whatever he does, Mr. Hussain, it's different work than what Mr. Sahajewani and Mr. Vittori do. So there's no merit to that claim at all. The board then properly rejected the company's belated request to set aside the election because it failed to file objections. It failed to otherwise timely raise the issue. It didn't raise the issue at all for more than six months after the deadline had passed. And the only matter properly before the board with respect to Mr. Vittori and Mr. Sahajewani was the union's challenges to their individual ballots. When the board resolves ballot challenges, it simply decides whether that individual ballot should be opened and counted or whether it should not be opened and excluded. And the board rightly resolved that issue. The board does not set aside elections based merely on challenge ballots. I see I'm over my time, so I don't know. Okay. Does anybody have any questions? Okay. You can sit down. Thank you. Does the petitioner have any time? All right. We'll give you one minute. If you want it, you don't have to take it. No. Okay. Great. We'll take the matter under submission. Thank you both very much.
judges: Garland, Griffith, Edwards